IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ANEURY BAEZ-ELIZA

Plaintiff,

v.

INSTITUTO PSICOTERAPEUTICO DE PUERTO RICO, *et al.*

Defendants.

Civil No. 09-1990 (SEC)

**OPINION and ORDER**

Before the Court is another discovery-related motion filed by the above-captioned parties. During the last year and a half, they have bombarded each other, and the Court, with more than 25 of these motions; the tally so far being nine different Court rulings, an admonition, and $500 in sanctions to both parties. At issue this time are ten documents containing email communications exchanged among Instituto Psicoterapeutico de Puerto Rico's ("INSPIRA") managerial employees and between INSPIRA and its attorneys. As on previous occasions, INSPIRA claimed that the attorney-client privilege protects these documents, but plaintiff Aneury Baez-Eliza disagreed. Docket # 119.[1] The documents were submitted for *in camera* review. Docket # 125.

**Procedural Background**

Baez-Eliza, a former INSPIRA employee, filed this suit under the Americans with Disabilities Act and the laws of the Commonwealth of Puerto Rico, claiming, in essence, that

---

[1] Attorneys Carlos R. Ramirez and Doris M. Del Castillo-Garcia from Curbelo, Baerga & Quintana Law Offices represent INSPIRA. Attorney Vilma M. Dapena-Rodriguez represents Baez-Eliza.

**CIVIL NO. 09-1990 (SEC)**                                                                 page 2 of 17

INSPIRA fired him because he is legally blind.[2] Discovery began in January 2010 (Docket # 7), and an Initial Case Management and Settlement Conference was held on March 21 (Docket # 12). There, after identifying discovery as a possible source of controversy, the Court advised the parties to avoid unnecessary disputes. Id. A month and a half later, however, the parties would turn the discovery process into an all-out war.

Baez-Eliza fired the first shot. Docket # 13. Unhappy about INSPIRA's initial disclosures, he filed a motion to compel, claiming that INSPIRA was withholding electronic communications in direct contravention of Rule 26's requirements. Id. The Court, however, denied the motion as premature, urged the parties to cooperate with each other in good faith, and provided them with additional time to work out differences. Docket # 14. A joint informative motion notifying the Court of an amicable resolution ended the first scuffle a few weeks later. (Docket # 17).

The parties were again hard at battle soon thereafter. This time, they quibbled over a request for admissions. On the one hand, INSPIRA claimed that Baez-Eliza had misled it in failing to answer timely by agreeing to an extension of time and then reneging on the agreement. (Docket # 18). On the other, Baez-Eliza charged INSPIRA with offering the Court a false account of the parties' interactions. Dockets # 18 and 21. Refusing to fall into an unnecessary "he said, she said" dispute, the Court granted the extension of time that INSPIRA had requested. Docket # 20. More motions on the issue and further accusations followed (Dockets # 21 and 22), but the Court's ruling remained unaltered (Docket # 26).

By October 18, 2010, cooperation and communication between the parties had completely broken down and hostilities had intensified. In response to Baez-Eliza's request for an inspection of electronic communications, INSPIRA asserted the attorney-client privilege as

---

[2] Baez-Eliza allegedly suffers from a condition known as "Leber's Hereditary Optic Neuropathy" which causes permanent and profound loss of vision. Docket # 1, ¶ 13.

**CIVIL NO. 09-1990 (SEC)**                                                                                          page 3 of 17

to many of the documents and refused to produce them. Dockets # 28 and 29. Believing that the privilege logs INSPIRA produced to support its claim were inadequate, Baez-Eliza asked to review the messages. Id. INSPIRA denied the request, and Baez-Eliza sought the Court's intervention with a motion to compel. Docket # 28. INSPIRA then opposed and moved the Court to review the documents *in camera*. Docket # 29.

After reviewing the parties' submissions, the Court concluded that INSPIRA's privilege claims were inadequately supported. Docket # 36. Nevertheless, the Court held in abeyance Baez-Eliza's motion to compel and allowed INSPIRA to file a supplemental motion as to its request for *in camera* review. Id. The Court also ordered the parties to confer about whether a court order under Fed. R. Evid. 502(d) would solve their dispute, and, if so, to file a proposed order for the Court's consideration. Id.[3]

The supplemental motions were timely filed. Dockets # 37 and 40. On review, the Court denied INSPIRA's privilege claim in connection with documents reflecting the scheduling of meetings with attorneys but granted *in camera* review as to the other documents, finding that INSPIRA's representations about their content appeared to support application of the privilege. Docket # 47. The Court also advised the parties (again) to consider a motion under Fed. R. Evid. 502(d) to avoid unnecessary delays and costs. Id.

INSPIRA submitted for *in camera* review 24 documents containing over 100 pages of electronic communications. Docket # 60. Nonetheless, after a detailed document-by-document analysis, the Court found INSPIRA's privilege claims defective and ordered all documents at issue to be produced. Docket # 70. Moreover, concerned with the marked discrepancies between INSPIRA's representations and the real content of the documents, the Court admonished

---

[3] Fed. R. Evid. 502(d) provides as follows: "A Federal court may order that the privilege or protection is not waived by disclosure connected with the litigation pending before the court—in which event the disclosure is also not a waiver in any other Federal or State proceeding."

**CIVIL NO. 09-1990 (SEC)**                                                                 page 4 of 17

INSPIRA, stating "that all along [it] had been walking too fine a line between a legitimate privilege claim and a frivolous attempt to improperly derail the case's progress." Id. at p. 2. The Court also warned INSPIRA that "[s]imilar conduct in future proceedings will result in more severe sanctions." Id. at p. 13.[4]

Notwithstanding the Court's ruling, the parties' fight continued. Now they attacked each other with cross motions to compel, each accusing the other of scheming to preclude the discovery of information relevant to the case. Dockets # 50, 63, 66, 71. Once again, however, the Court refused to intervene in the parties' sterile "he said, she said" contest, expressing, instead, that it remained "confident that the parties can solve all their impasses on their own through cool-headed analysis and good faith cooperation." Docket # 72. Moreover, the Court held in abeyance the parties' motions and ordered them to meet and confer in an attempt to resolve their differences. Id. In case an agreement proved impossible, the Court also informed the parties that it would issue a confidentiality order under Fed. R. Evid. 502(d), so that they could exchange and review all documents in controversy without waiving valid attorney-client privilege claims. Id. Lastly, concerned with the lack of cooperation and communication the parties were exhibiting, and the effect their unnecessary disputes were having on these proceedings, the Court warned the parties (for a second time) that "when ruling on the motions now pending or motions subsequently filed, the Court will impose all applicable sanctions, including monetary sanctions, if it determines that any party has raised frivolous, unfounded or unnecessary issues." Id.

Sure enough, the parties were unable to resolve their differences and resubmitted their dispute to the Court. Some of the parties' claims were meritorious, while others were completely frivolous. For example, despite the hornbook-law principle that the scope of

---

[4] On January 25, 2011, the Court denied INSPIRA's reconsideration motion (Dockets # 74 and 75); interlocutory appeal was not requested.

discovery includes any documentation that may lead to information admissible into evidence, INSPIRA refused to produce documents for the year 2009, arguing, among other things, that "the facts alleged in the Complaint do not extend beyond 2008...." Docket # 73, ¶ d. Baez-Eliza made similar flawed remarks to withhold information about his electronic message accounts. Docket # 66-2, ¶ 9.

The parties also refused to provide simple accommodations to each other. In particular, INSPIRA pressed Baez-Eliza for answers to interrogatories, even though it had acquired the answers sought during depositions and through statements furnished to it under penalty of perjury. Id. at ¶ e. Likewise, Baez-Eliza refused to produce post-employment W-2 forms and check stubs, arguing that INSPIRA, as Baez-Eliza's employer, was privy to the information. Id. at ¶ 4. In any event, the Court adjudicated the motions without imposing sanctions, as the parties had agreed to a proposed confidentiality order in a good faith attempt to iron out remaining differences. Dockets # 76 and 77. Yet another skirmish soon followed.

Although a confidentiality order was in full force and effect, the parties were again pitted against each other over the discovery of electronic communications. This time, Baez-Eliza claimed that INSPIRA strategically failed to specify which emails from a confidential list were privileged, in order to preclude their use in the deposition of INSPIRA's director. Docket # 88. INSPIRA, on the other hand, argued that Baez-Eliza refused to meet and confer in good faith and rejected a proposal that would have allowed all emails to be used at the deposition. Docket # 96. By then, the Court had already considered more than 22 discovery-related motions, issued more than six rulings, and warned the parties on two separate occasions that their unnecessary dispute would result in sanctions. Docket # 99. Therefore, finding that the motions at issue were avoidable through cool-headed analysis and good faith cooperation, the Court sanctioned each

**CIVIL NO. 09-1990 (SEC)**                                                                 page 6 of 17

party with $500.[5] The Court also ordered the parties to meet and confer, and, if valid differences remained thereafter, to file a joint informative motion and request *in camera* review of disputed documents. Id. Finally, for the third time, the Court warned the parties about the imposition of sanctions if their unnecessary dispute continued. Id.

Not surprisingly, the parties failed to come to terms, and the motions currently before the Court were filed. As stated above, the parties move the Court to decide whether the attorney-client privilege protects ten emails that INSPIRA refuses to disclose, each party posing different answers to the question. The Court's determination follows.

**Applicable Law and Analysis**

The Court has laid out the legal standard applicable here in prior rulings (Dockets # 36, 47, 70, and 76), and has stated in detail its views about the privilege's application to documents containing exchanges similar to the ones now at issue (Dockets # 47 and 70). Accordingly, at this juncture, it suffices to say that the tenet underlying the Court's analysis is that the attorney-client privilege applies to communications that reveal confidential information about the substance of a legal consultation. See Upjohn Co. v. United States, 449 U.S. 383, 391 (1981). Before delving into the analysis of the email messages, however, a few remarks about discovery are in order.

Our current rules of civil procedure were introduced many decades ago to effectuate a dramatic change in the way litigation was conducted. Hickman v. Taylor, 329 U.S. 495, 500 (1947). The rules in place at the time afforded litigants limited means to discover information necessary to prepare for trial. Id. In fact, the prior rules were premised on the idea that "a judicial proceeding was a battle of wits rather than a search for the truth[;] [thus] each side was protected to a large extent against disclosure of its case." 8 C. Wright, A. Miller & R. Marcus,

---

[5]On April 15, 2011, the Court denied Baez-Eliza's reconsideration motion (Dockets # 103 and 109); interlocutory appeal was not requested.

**CIVIL NO. 09-1990 (SEC)**                                                                 page 7 of 17

Federal Practice and Procedure § 2001, at p. 16 (3d ed. 2010). The new regime the current rules ushered in, however, require the parties to put all their cards on the table. Today litigation is "less a game of blind man's bluff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent." United States v. Procter & Gamble Company, 356 U.S. 677, 682-683 (1958). In this way, the current rules seek to streamline the litigation process in order to "secure the just, speedy, and inexpensive determination of every action and proceeding." Fed.R.Civ.P. 1; see also Nelson v. Adams USA, Inc., 529 U.S. 460, 465 (2000).

Central to today's federal civil litigation practice is Rule 26. Among other things, it unequivocally establishes that the scope of discovery is broad: "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense...." Fed.R.Civ.P. 26(b). And the term "relevant" encompasses any matter which may lead to admissible evidence at trial. Id. Although such a broad scope undoubtedly comports with the main purpose of the rules, it also presents unscrupulous litigants with the means to manipulate the process to their advantage. Indeed, instances of abuse are well-documented. See e.g., Deborah L. Rhode, In the Interest of Justice: Reforming the Legal Profession 82-86 (2000); Jean Cary, *Rambo Depositions: Controlling and Ethical Cancer in Civil Litigation*, 25 Hofstra L. Rev. 561, 565 (1996); Deborah L. Rhode, *Ethical Perspectives on Legal Practice*, 37 Stan. L. Rev. 589, 597-98, 628 (1985).

To fend off such excesses, litigants often resort to evidentiary privileges such as the attorney-client privilege. But this strategy also has the potential to be abused. Specially, when, as here, a litigant uses the privilege as a sword rather than a shield by interposing unfounded claims in an improper attempt to conceal documents depicting a client in an unflattering light. Some of the strains this practice causes in litigation are described accurately in Victor Stanley, Inc. v. Creative Pipe, Inc., 250 F.R.D. 251, 265 (D.Md. 2008). There, after discussing Rule

**CIVIL NO. 09-1990 (SEC)**                                                                          page 8 of 17

26(b)(5)(A)(ii), which requires the filing of a privilege log containing specific information to support an attorney-client privilege claim, the court remarked:

> Few judges find that the privilege log is ever sufficient to make the discrete fact-findings needed to determine whether a privilege/protection was properly asserted and not waived.... [T]he experience of many judges is that when the documents themselves are reviewed, it often turns out that a much smaller percentage of documents actually meet the requirements of the asserted privilege/protection than was claimed by the asserting party.
>
> ****
>
> Requesting parties also know of the limited utility of privilege logs (for they likely have served similar privilege logs in response to their adversary's discovery requests), and thus, when they receive the typical privilege log, they are wont to challenge its sufficiency, demanding more factual information to justify the privilege/protection claimed. This, in turn, is often met with a refusal from the producing party, and it does not take long before a motion is pending, and the court is called upon to rule on the appropriateness of the assertion of privilege/protection, often with the producing party's "magnanimous" offer to produce the documents withheld for *in camera* review. *In camera* review, however, can be an enormous burden to the court, about which the parties and their attorneys often seem to be blissfully unconcerned.

Id. (quotation marks in original). At any rate, when litigants decide to walk down this path—in direct contravention of the Rule's purpose—litigation turns into the entanglement of sorts that the Court is laboring to disentangle here. The process becomes needlessly longer and more expensive, wasting scarce judicial resources and clients' money along the way. Litigants are therefore duty-bound to avoid this situation by all means possible, and, of course, failing to do so is sanctionable under Fed.R.Civ.P. 26(g).

Turning to the motions now pending, the Court begins its analysis with INSPIRA's claim that a string of emails setting forth the date, time, and participants of a meeting with attorneys is privileged. Docket # 119, pgs. 12-15. Previously the Court rejected a similar contention (Docket # 47, p. 2), but INSPIRA insists in such a claim again, this time arguing that "disclosure of the fact that Inspira was consulting with its attorney regarding Plaintiff would

**CIVIL NO. 09-1990 (SEC)** page 9 of 17

taint a potential jury who would inevitably question the reasons why [it] sought such legal advice." Docket # 119, pgs. 13. Moreover, although these emails are devoid of legal content, INSPIRA inexplicably argues that they "contain[] legal information drafted in order to seek legal advice and to put the legal advice into practice." Id. at p. 12.

INSPIRA's position not only shows an ill-advised stubbornness but also reflects a poor understanding of the privilege's reach. See, e.g., Humphreys, Hutcheson, & Moseley v. Donovan, 755 F.2d 1211, 1219 (6th Cir. 1985) (holding that "the fact of legal consultation or employment... and the scope and nature of employment are not deemed privileged."); Diversified Industries, Inc. v. Meredith, 572 F.2d 596, 603 (8th Cir. 1978) (concluding that document which stated the purpose for which a law firm had been engaged was not privileged); Howell v. Jones, 516 F.2d 53, 58 (5th Cir. 1975)(observing that "[t]he great weight of authority... refuses to extend the attorney-client privilege to the fact of consultation or employment...."). Worse yet, INSPIRA's distorted representations about the content of these emails contravene its duty of candor to the Court. INSPIRA's conduct also flouts a Court admonition in connection with similar representations made in the past and a Court warning that sanctions would be imposed if the conduct was repeated. Docket # 70, p. 13. Therefore, true to its word, the Court **ORDERS** INSPIRA to pay **$1,000** as sanction for offering misleading representations to the Court. Needless to say, these emails are not privileged.

INSPIRA puts forth a similar questionable spin to its interpretation of at least one other document. Specifically, INSPIRA contends that an email sent to an attorney by its President, Dr. Alberto Varela, reflects Dr. Varela's views about a legal document filed in an administrative proceeding. Docket # 119, pgs. 115-16. An objective reading of this email, however, shows that Dr. Varela's remarks reveal nothing about the content of the legal document; rather, his statements convey his opinion about Baez-Eliza. The following portion of the email illustrates the point:

**CIVIL NO. 09-1990 (SEC)**                                                                 page 10 of 17

> Due to his slanderous distortions, acts of falsification, conspiratorial organization and evil intentions motivated exclusively by hostile greed, this fellow is an embarrassment to all disabled persons. For all intents and purposes it is obvious that he merely tries to pervert and exploit for his personal profit the jurisprudence that protects the rights of disabled persons, a noble cause when responsibly used. He should be ashamed of his brazenness. I imagine that he believes that the world owes him something.

Docket # 125, Exh. 9. In any event, INSPIRA argues that this document is privileged because it is marked as "confidential" and because it was addressed to attorneys. Docket # 119, p. 16. Neither of these arguments has merits. Labeling a document as confidential "may serve to put recipients on notice that the document is confidential, but it does not at all prove the existence of privilege." Tyne v. Time Warner Entertainment Co., L.P., 212 F.R.D. 596, 600, n. 4 (M.D.Fla. 2002)(decided under Florida state law); see also Medical Waste Techs. v. Alexian Bros. Med. Ctr., Inc., 1998 WL 387706 (N.D.Ill, July 30, 2010) (documents marked "confidential" found not privileged). As stated above, for the privilege to apply, its proponent must always show that the communication at issue reveals information about the substance of a legal consultation. See Upjohn Co., 449 U.S. at 391. And just stating that a client and an attorney converse is insufficient to make this showing. U.S. v. Johnston, 146 F.3d 785, 794 (10th Cir. 1998), *cert. denied*, 525 U.S. 1088 (1999).

   In similar fashion, INSPIRA contends that an email sent by INSPIRA's Director of Operations, Leila Martinez, to Dr. Varela is privileged because it "shows that Ms. Martinez... on Inspira's behalf, w[as] drafting [a] factual account to obtain legal advice from Inspira's attorneys." Docket # 119, pgs. 9-10. The email, however, has nothing to do with the preparation of such factual account or with the pursuit of a legal consultation. Rather, in this email, Martinez shares with Dr. Varela her impressions of a conversation she had about Baez-Eliza with INSPIRA's Human Resources Manager, Martha Gay. In fact, Martinez unequivocally states the purpose of the email in her closing paragraph:

**CIVIL NO. 09-1990 (SEC)**                                                                 page 11 of 17

> My opinion is that Martha is anxious with what has happened and recognizes that she had information that she forgot to convey. Anyway, it's very important for me to notify you about this immediately.... I think she herself, inadvertently, gave me information that she had which she now becomes aware of the mess it has created. That is my interpretation. I don't like this situation, but I immediately communicate it to you just in case.

Docket # 125, Exh. 4. As stated above, the attorney-client privilege applies only to communications that reveal the content of a legal consultation. Upjohn Co., 449 U.S. at 391. Accordingly, this email is not privileged.

INSPIRA also claims that an email sent to its attorneys and a job description attached to it are privileged. Docket # 119, p. 6-7.[6] INSPIRA reasons that the privilege applies to these documents because "[t]he email specifically states that [it] requests attorney Curbelo's review, analysis and recommendations based on a previous communication." Id. INSPIRA's contention, however, is flawed; neither the fact that attorneys were consulted nor the purpose of the consultation is privileged. Humphrey, Hutcheson, & Moseley, 755 F.2d at 1219; Diversified Industries, Inc., 572 F.2d at 603; Howell, 516 F.2d 58. Moreover, other than a blanket privilege assertion over the job description, INSPIRA has provided the Court with no explanation or legal authority to support its position about this document. See In re Keeper of Records (Grand Jury Subpoena Addressed to XYZX Corporation), 348 F.3d 16, 22 (1st Cir. 2003) (stating that the party asserting the privilege has the onus to establish its existence). Therefore, these documents are not privileged.

The same holds true about two messages in a string of emails exchanged between Dr. Varela and Martinez. Docket # 125, Exh. 2. INSPIRA claims that these two emails relate to requests for legal advice made to attorneys. Docket # 119, pgs. 7-9. As the following email

---

[6] The email in question reads as follows: "Here is the copy of the Job Description for the Position of Coordinator of the Foster Homes Program. I need your review, analysis and recommendations in view of the particular situation we already talked about. Let me know as soon as possible." Docket # 125, Exh. 2.

**CIVIL NO. 09-1990 (SEC)** page 12 of 17

excerpt shows, however, the purpose of Dr. Varela's message was to convey personal advice about words to use in an upcoming meeting with Baez-Eliza:

> Leila. Consider using the comment that [Baez-Eliza] made to you that "this is very demanding" so that you can use it somehow, if you can, for when you are going to meet with him. The advantage is that you USE HIS OWN REFLECTIONS and you don't have to convince him since he himself has noticed this. You don't have to do it but think about it since it can be useful for you.

Docket # 125, Exh. 5, p. 1 (emphasis and quotation marks in original). Likewise, Martinez's response had no connection with a legal consultation: "Yes, I am aware that using the words of the employee is major [sic] at almost all times, with the exception of when we notice that the employee is sufficiently "machiavellian" as to be trying to play his chips correctly." Id. (quotation marks in original). Hence, neither of these two messages is privileged.

Dr. Varela also appears to offer personal advice to subordinates at INSPIRA in at least one other document. Specifically, Dr. Varela makes the following remarks in an email in which he responds to a report given by INSPIRA's Branch Manager, Ileana Castro, about a legal consultation:

> Ileana. Thank you for this information and this consultation effort. I am surprised that the duties are not in writing since that is a routine which should always be observed. I DO NOT know what happened to Martha with regard to this. I hope Ileana has access to the file of the employee (and to that of all the employees since she is substituting for Martha). The main function is to TRAVEL TO CONTRACT HOMES. If Leila doesn't include this as the main duty it would be unfortunate. She should be sure to include it. She CANNOT include other functions nor include functions which appear to be in the same category because then the employee can claim saying that he can't travel, but that "he can do the others" as if "the others" can be substituted one for the others, which would cause us problems. THAT IS, A LIST OF DUTIES CANNOT BE PREPARED AS IF IT WERE A CHINESE FOOD MENU.
>
> What I do believe that he can be told at some point is "Eneury, I have observed that YOU HAVE NOT BEEN ABLE to perform your work nor fulfill the goals. Tell me what is the matter? Perhaps this is not the job for you. Even though you're a good person, we can't continue placing you in a situation where you will not be able to fulfill the goals because the company would be affected. Therefore, we are forced to cancel your

**CIVIL NO. 09-1990 (SEC)**                                                                page 13 of 17

> contract. Perhaps in the future we can offer you something different. We thank you for your effort. Tell me if there is anything else we can do for you. For this we can't wait until the last day. We have to do it 30 days in advance.

Docket # 125, Exh. 11 (emphasis and quotation marks in original). Although INSPIRA correctly claims that the email to which Dr. Varela replied is privileged (Docket # 119, pgs. 17-18), it fails to address Dr. Varela's response altogether. Indeed, this conclusion is buttressed by INSPIRA's description of the document: "In *this* email Ms. Ileana Castro informs Dr. Varela regarding the legal advice sought from attorneys Curbelo and Hernandez." Id. (emphasis supplied). Without the benefit of INSPIRA's position, the Court is unable to determine whether Dr. Varela's remarks are informed by, and thus reveal, legal advice, or whether they convey his personal opinion. Accordingly, because INSPIRA has failed to carry its burden of proof, Dr. Varela's email is not privileged. See In re Keeper of Records, 348 F.3d at 22.

INSPIRA's privilege claims in connection with the remaining documents stand on stronger footing. Different from other occasions, INSPIRA has shown that these documents reveal the substance of legal consultations. Therefore, because the Court is satisfied that INSPIRA has proven all the elements of the attorney-client privilege, these documents are privileged.

Baez-Eliza's allegation that the crime-fraud exception applies in this case is misplaced. Docket # 119, pgs. 119-122. This exception pierces the attorney-client privilege when a client seeks legal advice with the intent to commit illegal acts. See, e.g., Clark v. United States, 289 U.S. 1, 15 (1933) ("A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told."); Horizon of Hope Ministry v. Clark County, 115 F.R.D. 1, 5-6 (S.D. Ohio 1986) (applying the fraud-crime exception in the context of a civil rights case). The onus to prove that the exception applies, of course, is on the movant, who must show that "the client was engaged in (or was

**CIVIL NO. 09-1990 (SEC)**                                                                 page 14 of 17

planning) criminal or fraudulent activity when the attorney-client communications took place; and (2) that the communications were intended by the client to facilitate or conceal the criminal or fraudulent activity." In re Grand Jury Proceedings (Gregory P. Violette), 183 F.3d 71, 75 (1st Cir. 1999). Here, Baez-Eliza has failed to satisfy his burden. Assuming *arguendo* that INSPIRA's actions met the first part of the applicable standard, Baez-Eliza has provided the Court with absolutely no evidence from which to conclude that INSPIRA intended to use the lawyer's advice to transgress the boundaries of legality. Quite the contrary, the documents at issue show that INSPIRA's intent in seeking legal advice was to abide by the law when dealing with what appeared to be perceived as an undesirable relationship with Baez-Eliza. In these circumstances— when a client asks a lawyer to analyze a situation in a manner that would best support his position according to the lawyer's understanding of the law— the attorney-client privilege is at its zenith. See U.S. v. Zolin, 491 U.S. 554, 562 (1989). Accordingly, INSPIRA's privilege claim as to the remaining documents stands.

In sum, for the foregoing reasons, INSPIRA's privilege claim with respect to exhibits No. 125-2, 125-4, 125-7, 125-8, 125-9, the first two emails in exhibit 125-3, and the first email in exhibit 125-11 are not protected by the attorney-client privilege. All other exhibits are. Moreover, INSPIRA is **ORDERED** to pay **$1,000** to the Clerk of Court by **June 24, 2011**.

**Conclusion**

As stated on prior occasions, the Court believes that the parties' discovery dispute was unnecessary. Perhaps blame rests more with one party than with the other, and, in fact, some of INSPIRA's submissions along this process exhibited reprehensible gamesmanship. On the other hand, however, the record also shows that Baez-Eliza responded in kind with some of his submissions. With this conduct, the parties allowed the heated feelings that litigation too often engenders to prevail over basic notions of civility.

**CIVIL NO. 09-1990 (SEC)**                                                                 page 15 of 17

Unfortunately, the shortcomings just described have afflicted the legal profession over the years. Legal literature and court opinions on the subject abound. <u>See e.g.</u>, Douglas R. Richmond, *The Ethics of Zealous Advocacy*, 34 Tex. Tech. L. Rev. 3 (2002); <u>Revson v. Cinque & Cinque, P.C.</u>, 70 F. Supp. 2d 415, 434-436 (S.D.N.Y. 1999). The situation appears to be no different in this District, where the Court hosted a seminar on civility less than three months ago. As expressed there, the notion that civility is in direct contravention with zealous advocacy is at the root of the problem. But nothing could be further from the truth.

Civility is "an approach that seeks to diminish rancor, to reconcile, to be open to nonlitigious resolution." <u>Revson</u>, 70 F. Supp. 2d at 434 (citing Jerome J. Shestack, *Defining Our Calling*, 83 A.B.A. J. 8 (Sept 1997) (Jan. 1999). Litigants can be aggressive and tough while still being civil and courteous. <u>Id.</u> Civility, however, is at odds with,

> A mindset that litigation is war and that describes trial practice in military terms.
>
> A conviction that it is invariably in your interest to make life miserable for your opponent.
>
> A disdain for common courtesy and civility, assuming that they illbefit the true warrior.
>
> A wondrous facility for manipulating facts and engaging in revisionist history.
>
> A hair-trigger willingness to fire off unnecessary motions and to use discovery for intimidation rather than fact-finding.

<u>Revson</u>, 70 F. Supp. 2d 434 (citing Robert N. Sayler, *Why Hardball Tactics Don't Work*, 74 A.B.A. J. 78, 79 (Mar. 1988).

This conduct, properly labeled "incivility," disserves clients and the justice system as a whole. The Honorable Sandra Day O'Connor articulated as much many years ago:

> [T]he justice system cannot function effectively when the professionals charged with administering it cannot even be polite to one another. Stress and frustration drive down productivity and make the process more time-consuming and expensive. Many of the best people get driven away from

**CIVIL NO. 09-1990 (SEC)**                                             page 16 of 17

> the field. The profession and the system itself lose esteem in the public's eyes.
>
> ....
>
> .... In my view, incivility disserves the client because it wastes time and energy—time that is billed to the client at hundreds of dollars an hour, and energy that is better spent working on the case than working over the opponent.

Sandra Day O'Connor, *Civil Justice System Improvements*, ABA at 5 (Dec. 14, 1993) (footnote omitted).

Moreover, incivility is counterproductive in court. When a court or a jury sees incivility, it is viewed as a sign of weakness rather than strength, and as an effort to obstruct rather than to present the facts and the law fairly. The result is that the lawyer's presentation is received with skepticism rather than trust. In turn, this undermines the lawyer's credibility and ability to persuade the court or the jury.

For all these reasons, the Court takes this opportunity to urge litigants and the general Bar to adopt civility as a standard of professional conduct. By doing so, you will be contributing to the continued improvement of the Bar, and of the Court, while also providing a better service to your clients.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 16th day of June, 2011.

                                                s/ *Salvador E. Casellas*
                                                SALVADOR E. CASELLAS
                                                Senior U.S. District Judge